COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, *ss.*

SUPREME JUDICIAL COURT
FOR SUFFOLK COUNTY
DOCKET NO. BD-2023-006

IN RE: DANIEL G. RUGGIERO

MEMORANDUM OF LAW AND ORDER OF TERM SUSPENSION

This matter came before me on an Information and Record of Proceedings filed by the Board of Bar Overseers (board) in January, 2023, under S.J.C. Rule 4:01, § 8 (6), as appearing in 453 Mass. 1310 (2009). The respondent, Daniel G. Ruggiero, was charged with participating in a scheme with nonlawyers to charge and collect illegal and excessive fees from fifteen clients – homeowners in Massachusetts and Rhode Island seeking mortgage assistance relief work. The respondent also was charged with failing to supervise nonlawyers with whom he worked, using a misleading law firm name, and sharing fees with nonlawyers. Count I of the petition regards the respondent's activities generally, while Count II focuses on one particular Rhode Island client.

A hearing was held on March 2, 2023, attended by assistant bar counsel and the respondent, and, on consideration thereof and for the reasons set forth below, it is ordered that the respondent's license to practice law is suspended for a period of one year and one day.

1. <u>Background</u>. The following facts were found by the hearing committee. The respondent was admitted to the Massachusetts Bar on December 1, 2006, and to the Rhode Island Bar on January 1, 2007. At all times relevant to this matter, the respondent lived and worked mostly in Florida and maintained a "by appointment only" office in Massachusetts. He

first began reviewing mortgage loan modification submissions in 2012.[1]

In 2017, the respondent entered a relationship with two companies, NVA Financial Services (NVA) and ND Processing (ND).  Neither entity is a law firm; both were owned and operated by nonlawyers.  During 2017 and 2018, NVA assigned the respondent fifteen cases in Massachusetts or Rhode Island.  Each case involved clients facing foreclosure, and all were handled in the same manner.

According to the hearing report, entities such as NVA commonly affiliated with attorneys for foreclosure defense work, known as mortgage assistance relief services (MARS).  This practice stemmed from an exception to a Federal regulation passed in the wake of the 2008 mortgage crises.  See 12 C.F.R. § 1015.7 (a)-(b).  That regulation banned the collection of advance fees but provided an exception for attorneys.  See id.

NVA handled marketing, intake, and client services.  During an initial call, NVA obtained basic information from clients.  Afterward, NVA sent potential clients a fee agreement (fee agreement) and notified the respondent that he had a new assignment.  NVA drafted the original version of the fee agreement, and the respondent reviewed that draft and approved it.

On executing the fee agreement, clients were required to pay an initial amount of $1,250

---

[1] During 2012 and 2013, the respondent was a "Class B Partner" for both the Mortgage Law Group, LLP, and Consumer First Legal Group, LLC.  In that role, he reviewed hundreds of mortgage loan intakes and modification submission packages.  In 2014, both entities were found to have violated the Consumer Financial Protection Act as well as 12 C.F.R. §§ 1015.1, commonly referred to as "Regulation O," for, in part, "attract[ing] distressed homeowners" and "deceptively promising that they would assist homeowners in obtaining loan modifications and foreclosure relief in exchange for the payment of advance fees."  The respondent was not a named defendant in that action.  However, the respondent testified that the action concerned the collection of advance fees and the work of nonlawyers.  In 2015, the respondent formed Pinnacle L. Group, Inc. (Pinnacle).  In 2020, the respondent admitted via stipulated final judgment to violating the Telemarketing and Consumer Fraud and Abuse Prevention Act and the Telemarketing Sales Rule by providing "substantial assistance or support" to a telemarketer that solicited advance fees.

for "negotiating a loss mitigation solution."  Clients also were responsible to pay a recurring $900 monthly fee for "continued loss mitigation services," regardless of whether any actual work was done on a client's account that month.  In addition, the fee agreement required clients to enter into an "Account Servicing Agreement" with Reliant Account Management (RAM).  That agreement, in turn, authorized RAM automatically to debit legal fees from clients' personal checking accounts.

Once a client paid the initial retainer, NVA transferred that client's file to ND.  ND thereafter was responsible for organizing the loan-modification package and negotiating with the lender.  An unsigned contract between the respondent and ND specified that ND would "process" loan modification requests, which included:  collecting documents from clients; processing the loan mitigation files, including communications with clients; conducting a "welcome call" with clients; submitting the loan modification package to the lenders; reviewing loan modification offers with clients; assessing liens on the property; and working with clients to obtain subordination agreements or payoffs of liens.

The respondent paid to NVA ninety percent (90%) of the gross amounts collected from his mortgage loan modification clients.  The respondent admitted that the arrangement amounted to fee sharing with a nonlawyer in violation of Massachusetts and Rhode Island Rules of Professional Conduct.  The respondent paid ND $75 on the submission of a loan modification package and $75 per month thereafter.  The respondent explained that he paid ND to do this work because it was more efficient.

a. Borrower Lisa McConaghy.  On or about October 30, 2017, borrower Lisa McConaghy (McConaghy) called NVA because she had defaulted on her mortgage loan. McConaghy was a third-grade teacher in Rhode Island who worked part-time at Walmart and Home Depot to supplement her income.  During the call, McConaghy informed NVA that she

had entered into three prior loan modifications with her lender,[2] and that she did not want to spend money on another modification attempt if she had no hope of success.  NVA assured McConaghy that it could help.

That same day, NVA assigned McConaghy's case to the respondent.  Shortly thereafter, they entered into the standard fee agreement.  Because McConaghy could not afford the $1,250 initial payment, NVA agreed that she could pay half up-front, but informed her that no work would take place until the entire fee was paid in full.  On November 13, 2017, RAM withdrew $625 from McConaghy's checking account, ninety percent (90%) of which was sent to NVA and ten percent (10%) to the respondent.  RAM made a further withdrawal of $625 on November 27, 2017, dispersing the funds in the same proportion.  Although the initial fee had been paid in full, neither NVA nor the respondent took any action on McConaghy's behalf.

On December 4, 2017, McConaghy contacted NVA complaining that her lender was calling her repeatedly and that she was anxious to move forward now that she had paid the initial fee.  The next day, an employee of ND, Jackie Pulcano (Pulcano), began work on her file.  ND requested several documents from McConaghy, which she provided.

On December 27, 2017, McConaghy contacted NVA and requested that the monthly fee payment for December be moved to January.  Later that same day, RAM withdrew the $900 monthly fee from McConaghy's bank account and dispersed the funds in the same proportion as it had in the past.

While collecting fees and gathering paperwork, ND determined that modification of McConaghy's loan would be unlikely.  On December 27, 2017, Pulcano spoke with

---

[2] McConaghy testified that she had entered into four modifications before October 2017. The hearing committee found four to be the correct number of prior modifications, attributing her misstating that there had been three to a mistake and not to deceit.

McConaghy's lender and learned that it had designated the loan as "continuous default only option is reinstatement or liquidation [sic]."  Pulcano wrote in an e-mail and contemporaneous notes that McConaghy had defaulted on four prior loan modifications but had been "miraculously approved for another trial in October of 2017 and also defaulted."  Arrears were estimated at $11,000 and foreclosure proceedings had begun.  Pulcano also noted that McConaghy could file a Chapter 13 bankruptcy petition.

In response to this information, Pulcano's supervisor directed her to submit the mortgage loan modification package "quickly."  From there, they could "address matters after the denial [was] generated."  Pulcano forwarded McConaghy's documents to the lender, adding only a facsimile cover sheet to the materials provided by McConaghy.

The respondent did not respond to e-mails from Pulcano or her supervisor, nor did he inform McConaghy of what ND had learned from the bank or its decision to proceed.  Moreover, the respondent did not review McConaghy's application.  Had he done so, the respondent likely would have noticed that McConaghy erroneously reported monthly wages of "$7,400," rather than the actual figure, $4,700.00.[3]

---

[3] The hearing committee found that the respondent rarely attended to his clients' matters. Rather, he routinely left all the labor to nonlawyers at ND.  In the words of the hearing committee, the respondent "performed very little actual work."

The hearing committee found as not credible the respondent's testimony that he reviewed all file notes and supervised ND's agents on McConaghy's case or other client matters.  More specifically, the respondent,

"discussed nothing with McConaghy before her application was submitted.  He and his agents failed to communicate with her, failed to update her as new information came to light, and mislead her about her prospects of success . . . .  McConaghy was not informed that ND had learned on or about December 7, 2017[,] that her application had little chance of success, and was not advised about her options.  The respondent never apprised her that foreclosure proceedings had begun.  Indeed, the respondent never spoke to her about her application, contacting her only after it had been denied, and after being told to do so by [an ND employee]."

On January 22, 2018, ND learned that, as had been expected, McConaghy's lender denied her request for loan modification and that the property was scheduled for sale on March 9, 2018. ND instructed the respondent to contact McConaghy, which he did for the first time on January 22, 2018.  The respondent recommended that McConaghy file for bankruptcy and stated that he could represent her in the bankruptcy case for an additional $400.

McConaghy was charged another $900 on January 26, 2018.  This fee was charged even though NVA had told the respondent that it would suspend billing, given McConaghy's situation. The withdrawal resulted in a negative account balance, which was not fixed until RAM issued a series of refunds in February 2018.  In early May 2018, McConaghy filed her complaint against the respondent with the Office of Bar Counsel (bar counsel).  On June 20, 2018, after the complaint had been filed, the respondent refunded $1,250 to McConaghy.

2.  Disciplinary proceedings.  In March 2021, the respondent was charged with two counts of violating the disciplinary rules of Massachusetts and Rhode Island.  Count I concerned the respondent's handling of fourteen unnamed Massachusetts and Rhode Island clients during 2017 and 2018.  Count II focused on the respondent's interactions with McConaghy.[4]

In its complaint, bar counsel alleged that the respondent participated in a scheme with nonlawyers to charge and collect illegal and excessive fees from vulnerable homeowners.  As part of this scheme, bar counsel also alleged that the respondent had failed to supervise

---

[4] A Massachusetts lawyer "may be subject to the disciplinary authority of both this jurisdiction and another jurisdiction for the same conduct."  Mass. R. Prof. C. 8.5 (a), as appearing in 454 Mass. 1301 (2009).  Rule 8.5 (b) (2), as appearing in 454 Mass. 1301 (2009), of the Massachusetts Rules of Professional Conduct advises application of the rules of the jurisdiction where the respondent's principal office is located, "unless the predominant effect of the conduct is in a different jurisdiction, in which case the rules of that jurisdiction shall be applied."  The "predominant effect" of the respondent's conduct in Count I occurred in both Massachusetts and Rhode Island.  The "predominant effect" of the respondent's conduct in Count II occurred in Rhode Island.

nonlawyer coworkers, used a misleading law firm name, and shared fees with nonlawyers.  The respondent's conduct was alleged to violate Mass. R. Prof. C. 1.5 (a), as amended, 480 Mass. 1315 (2018) (charging illegal and clearly excessive fees); rule 5.3 (b), as appearing in 471 Mass. 1447 (2015) (failing to supervise nonlegal staff); rule 5.3 (c), as appearing in 471 Mass. 1447 (2015) (knowingly ratifying misconduct of nonlawyers); rule 5.4 (a), as amended, 474 Mass. 1302 (2016) (splitting fees with nonlawyers); rule 7.1, as appearing in 471 Mass. 1468 (2015) (making misleading communication about lawyer's services); rule 7.5 (a) and (d) as appearing in 471 Mass. 1477 (2015) (representing through his firm name and letterhead ["Daniel Ruggiero, Esq. & Associates"] that he was in an organization as opposed to being a solo practitioner); rule 8.4 (a), as appearing in 471 Mass. 1483 (2015) (knowingly violating Rules of Professional Conduct); rule 8.4 (c), as appearing in 471 Mass. 1483 (2015) (engaging in conduct that involves dishonesty, deceit, fraud, or misrepresentations); and rule 8.4 (h), as appearing in 471 Mass. 1483 (2015) (engaging in other conduct that reflects adversely on his fitness to practice law). The respondent also was charged with violating the corresponding rules of Rhode Island, which, other than lacking an equivalent to rule 8.4 (h), are identical to the Massachusetts rules.  In his answer, the respondent denied that his agreements with NVA and ND constituted fee sharing with nonlawyers, his fees were unreasonable or illegal, and his fee agreement contained any "intentionally misleading representations."  The respondent, however, acknowledged that his firm's name was improper and that he had provided inadequate supervision on some aspects of McConaghy's file.

a.  Hearing committee.  A virtual hearing was held on November 30, and December 7, 9, 10, and 20, 2021.  Seventeen exhibits were admitted, and two witnesses testified:  the respondent and McConaghy.  On February 15, 2022, the parties filed their proposed findings of fact and conclusions of law.

The hearing committee issued its written decision on May 17, 2022.  It determined, by a preponderance of the evidence, that bar counsel proved that the respondent violated rule 1.5 (a), seeking excessive or illegal fees; rule 5.3 (b), failing to supervise the conduct of nonlawyer agents to ensure compliance with ethical obligations; rule 5.3 (c), ratifying misconduct perpetuated by nonlawyer agents; rule 5.4 (a), sharing fees with a nonlawyer; rule 7.1, making false or misleading communications about the lawyer's services; rule 7.5 (a), using a firm name or letterhead to violate rule 7.1; rule 7.5 (d), stating or implying that the lawyer works in a partnership or other organization when they do not; rule 8.4 (a), engaging in conduct which attempts to violate the rules of professional conduct or which assists or induces others to do so; and rule 8.4 (c), engaging in conduct that involves fraud, deceit, or dishonesty.  The hearing committee also found that bar counsel proved violations of R.I. R. Prof. C. 1.1, 1.4 (a), 1.4 (b), 8.4 (a), and 8.4 (c), by providing incompetent or misleading information concerning the viability of his clients' applications.

The hearing committee rejected the respondent's proposed mitigating factors.[5]  In aggravation, the committee found that the respondent was an experienced attorney, had violated numerous disciplinary rules concurrently, had caused harm to many clients, displayed a lack of candor to the committee, and had a relevant disciplinary history in the form of a 2013 diversion agreement.  The hearing committee was divided on whether, as bar counsel suggested, the

---

[5] For example, the hearing committee rejected the respondent's claim that McConaghy did not suffer harm because she received a full refund and was able to stay in her home.  Rather, the committee observed that McConaghy "had to fight and wait to get her full refund," and that redress was made "only after [she] contacted bar counsel."  See Matter of Lansky, 22 Mass. Att'y Discipline Rep. 443, 450 (2006) (restitution made after complaint to bar counsel does not merit weight in mitigation).  In considering changes made by the respondent to his practice – such as ceasing to use "& Associates" in his firm name and terminating his fee arrangement with NVA – the hearing committee noted that these were "wise precautions," but they are not considered mitigating.  See Matter of Goldberg, 34 Mass. Att'y Discipline Rep. 135, 138 (2018).

respondent's conduct was intentional and, as such, should be considered an aggravating factor.[6]
The committee disagreed with bar counsel that the respondent had targeted "vulnerable" clients
or had interfered with or influenced testimony.[7]  The hearing committee recommended that the
respondent be suspended from the practice of law for a period of one day and one year.

b.  Appeal to the board.  The respondent appealed to the board in June 2022.  The
respondent argued that his willingness to represent McConaghy, and then allegedly failing to do
so adequately when he knew, or should have known, that he had no ability to aid her, should not
constitute a violation of Rhode Island rules 1.1, 1.4, or 8.4.  The respondent further argued that:
the committee incorrectly deemed his fee agreement illegal because the statute that it violates, 12
C.F.R. § 1015.5, recently had been invalidated by the United States Court of Appeals for the
Seventh Circuit; the hearing committee's consideration of the respondent's stipulated diversion
agreement as an aggravating factor was improper; the committee incorrectly determined that he
was not engaged in the practice of law; there is a materiality requirement for Mass. R. Prof. C.
7.1 violations that the committee disregarded; and he did not admit to violating Mass. R. Prof. C.
5.3 when he conceded that he "failed on certain occasions to supervise the nonlawyers working
under his supervision."

The board adopted most of the hearing committee's decision and filed an information

---

[6] While one member of the hearing committee believed that the respondent's behavior
was calculated and should act as an aggravating factor, a second member believed that, because
intentionality already was a required factor for at least some of the violations, it should not be
"double-counted" against him.  The final member of the committee found that the respondent's
conduct fell short of that required to show intentional conduct.

[7] Although the respondent's clients were in financial distress, economic factors alone, the
committee found, were insufficient to qualify them as "vulnerable."  Additionally, the committee
found that any attempts to contact McConaghy prior to her testifying at hearing were
unsuccessful; as such, the attempted contact was determined not prejudicial to the administration
of justice.

with this court also recommending that the respondent be suspended for one year and one day. Like the hearing committee, the board concluded that the respondent violated Massachusetts Rules of Professional Conduct:  1.5 (a) by charging illegal and clearly excessive fees; 5.3 (b) by failing to supervise nonlegal staff;  5.3 (c) by knowingly ratifying the misconduct of nonlawyers; 5.4 (a) by splitting fees with nonlawyers; 7.5 (d) by implying through his firm name and letterhead that he was in an organization as opposed to being a solo practitioner; 8.4 (a) by knowingly violating the Rules of Professional Conduct; and 8.4 (c) by engaging in deceitful behavior concerning the nature and extent of his work for clients.  However, the board disagreed with the hearing committee regarding rule 7.1 (a), determining that the rule includes a materiality requirement and that bar counsel did not prove materiality adequately.[8]  Consequently, without a violation of rule 7.1 (a), the board could not conclude that the respondent violated rule 7.5 (a).

In weighing aggravating and mitigating circumstances, the board agreed with the hearing committee that the respondent had failed to show any mitigating factors applied.  Additionally, the board agreed that the respondent's decade-long experience as a lawyer, lack of candor, harm caused to his clients, and the multiplicity of his violations were appropriate aggravating factors. The board likewise concurred with the hearing committee in its determination that bar counsel did not meet its burden in demonstrating that the respondent's clients were "vulnerable."

Additionally, the board disagreed with the committee's determination that the 2013 diversion agreement constituted prior discipline that may be considered toward sanction in this

---

[8] The board claimed that to find a misrepresentation "material," such that it violates rule 7.1 (a), bar counsel must provide evidence that the misrepresentation was "so substantial and important as to influence [the] party to whom [it is] made."  Black's Law Dictionary (5th edition).  Bar counsel produced no evidence that the fee agreement containing the misrepresentations influenced the clients to hire the respondent.  As such, the respondent's misrepresentations did not violate rule 7.1 (a) and, by extension, could not support a violation of rule 7.5 (a).

matter.  Instead, the board agreed with the respondent that a successfully completed diversion agreement may not be considered for the purposes of aggravation.  To do so, the board concluded, jeopardized the incentive for lawyers to agree to diversion and risked an important tool for education.

The board determined that the offenses found in the respondent's matter are more concerning than "typical matters involving neglect, lack of communication, and improper delegation."  The board therefore agreed with the hearing committee's recommendation of suspension for one year and one day.  In addition, the board recommended that any sanction imposed by the court, even a lesser one, should require the respondent to apply for reinstatement.

c.  <u>Information and record of proceedings before this court</u>.  The board filed an information and record of proceedings before this court, pursuant to S.J.C. Rule 4:01, § 8 (6), on December 12, 2022.  A hearing was held on March 2, 2023.

3.  <u>Discussion</u>.  a.  <u>Standard of review</u>.  We uphold "[t]he subsidiary findings of the hearing committee, as adopted by the board, '. . . if [they are] supported by substantial evidence.'" <u>Matter of Weiss</u>, 474 Mass. 1001, 1001 n.1 (2016), quoting S.J.C. Rule 4:01, § 18 (5), as appearing in 453 Mass. 1315 (2009).  See <u>Matter of Abbott</u>, 437 Mass. 384, 391 (2002), and cases cited.  "[T]he hearing committee's ultimate 'findings and recommendations, as adopted by the board, are entitled to deference, although they are not binding on this court.'"  <u>Weiss</u>, <u>supra</u>, quoting <u>Matter of Ellis</u>, 457 Mass. 413, 415 (2010).  See <u>Matter of Lupo</u>, 447 Mass. 345, 356 (2006); <u>Matter of Hiss</u>, 368 Mass. 447, 461 (1975).  The hearing committee is the sole judge of credibility.  <u>Matter of Zankowski</u>, 487 Mass. 140, 144, 37 Mass. Att'y Discipline Rep. 554 (2021).  Accordingly, its "credibility determinations will not be rejected unless it can be said with certainty that the finding was wholly inconsistent with another implicit finding" (internal quotations omitted).  <u>Matter of Haese</u>, 468 Mass. 1002, 1007 (2014).

b.  <u>Rule violations</u>.  i.  <u>Fee agreement and fees (rules 1.5 [a], 8.4 [a], [c], and [h])</u>.  Rule 1.5 (a) provides that "a lawyer shall not enter into an agreement for, charge, or collect an illegal or clearly excessive fee or collect an unreasonable amount for expense."[9]  Rule 8.4 (a) provides that a lawyer shall not "violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another," and rule 8.4 (c) prohibits an attorney from "engag[ing] in conduct involving dishonesty, fraud, deceit or misrepresentation."  Rule 8.4 (h) prohibits lawyers from "engag[ing] in any other conduct that adversely reflects on his or her fitness to practice law."

The record supports the hearing committee's conclusion that the respondent violated each of these rules.  As an initial matter, the fee agreement represented that the respondent would negotiate personally with lenders.  There is substantial evidence in the record that this promise was "illusory and false."  Similarly, substantial evidence supported the committee's conclusion that the representation that nonlegal services "may be provided by outside servicing Agents, all of whom shall be engaged, compensated, and supervised by Daniel Ruggiero, Esq. and Associates" was false.  The nonlawyer agents all were hired and paid by NVA or ND.  To the extent that the respondent occasionally may have supervised agents, the record supports the committee's finding that there were no "Associates."  Indeed, the respondent conceded as much. See Mass. R. Prof. C. 8.4 (c), (h).

---

[9] The text of rule 1.5 (a) lists several factors to consider when determining whether a fee clearly is excessive:  (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly; (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer; (3) the fee customarily charged in the locality for similar legal services; (4) the amount involved and the results obtained; (5) the time limitations imposed by the client or by the circumstances; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and (8) whether the fee is fixed or contingent.

The record supports the hearing committee's conclusion that the nonrefundable advance fee, as provided for in the fee agreement, violated the Massachusetts Rules of Professional Conduct as well as corresponding Rhode Island rules.  See, e.g., In re Sharif, 459 Mass. 558, 564 (2011) (advanced fees "belong to the client until earned by the attorney"); Smith v. Binder, 20 Mass. App. Ct. 21, 23-24 (1985), citing ABA Comm. on Ethics & Professional Resp., Informal Op. 998 (1967) (unethical to require agreement that retainer be nonrefundable because of chilling effect on client's right to change attorneys); Mass. R. Prof. C. 1.5 (a); Rhode Island R. Prof. C. 1.5, comment 4 ("a lawyer may require advance payment of a fee but is obliged to return any unearned portion").

The record also supports the hearing committee's conclusion that the respondent's fees were excessive in violation of rule 1.5 (a).  The record supports a finding that the respondent "performed very little actual work" on client matters to justify his legal fees.  In McConaghy's case, the respondent's first conversation with McConaghy occurred after her loan modification had been rejected, and several months after she retained the respondent.  Indeed, the respondent failed to notice an obvious error on McConaghy's application – "$7,400" reported in gross monthly wages rather than the correct amount, $4,700 – supporting the finding that he neither reviewed nor worked on McConaghy's file.  The respondent's approach to McConaghy's case supports the hearing committee's conclusion that the respondent regularly charged fees well above what he earned.[10]  See Commonwealth v. Garvey, 99 Mass. App. Ct. 139, 145 (2021)

---

[10] The hearing committee reasoned that even if the respondent's work on client cases justified the flat $1,250 retainer, this does not account for the subsequent $900 payments that were deducted automatically each month.  The respondent argued that the $900 payments constituted a "classic retainer."  However, the automatic nature of the deductions, in tandem with the respondent's inability to explain the activities in which he engaged to earn those payments, further supports the committee's conclusion that the fees were excessive relative to actual work performed.

(inferences drawn by fact finder "need not be 'necessary or inescapable,' but instead need only be 'reasonable and possible'" [citation omitted]).

Finally, the record supports the hearing committee's determination that the respondent's fees violated Federal and State consumer protection regulations and rules 1.5 (a) and 8.4 (h).  See Matter of Zak, 476 Mass. 1034, 1037, 33 Mass. Att'y Discipline Rep. 522 (2017) ("Fees collected in violation of Federal or [S]tate statutes or regulations are prohibited under rule 1.5 [a]").  Title 940 Code Mass. Regs. § 25.02(2) provides, in relevant part:

> "It is an unfair or deceptive act in violation of M.G.L. c. 93A, § 2 (a)[,] to solicit, arrange, or accept an advance fee in connection with offering, arranging or providing Foreclosure-related Services; provided, however, that [this statute] shall not prohibit a licensed attorney from soliciting, arranging or accepting an advance fee or retainer for legal services . . . to avoid a foreclosure.  Provided further, however, that a licensed attorney accepting an advance fee or legal retainer must comply with all applicable laws and regulations pertaining to such fees, including the Massachusetts Rules of Professional Conduct, specifically Rules 1.5 and 1.6" (emphasis added).

Here, the respondent does not contest that he deposited advance fees directly into his operating account, rather than a client trust account, or that he shared fees with nonlawyers in violation of Mass. R. Prof. C. 5.4.  As such, the respondent is not exempt from liability under 940 Code Mass. Regs. § 25.02(2).  Neither is the respondent, for the reasons discussed supra, exempt from liability under the analogous Federal regulation, 12 C.F.R. §§ 1015 (Regulation O).[11]

The respondent counters that his fees were not illegal under Federal law because the

---

[11] Regulation O states, in relevant part:

"An attorney is exempt from . . . [the prohibition on collection of advance payments and related disclosures] if the attorney:  . . . (3) [c]omplies with [S]tate laws and regulations that cover the same type of conduct the rule requires[;] . . . [and] [b](1) [d]eposits any funds received from the consumer prior to performing legal services in a client trust account; and (2) [c]omplies with all [S]tate laws and regulations, including licensing regulations, applicable to client trust accounts."

12 C.F.R. § 1015.7 (Exemptions).

Seventh Circuit invalidated Regulation O in <u>Consumer Fin. Protection Bur</u>. v. <u>Consumer First</u> <u>Legal Group</u>, 6 F.4th 694, 704-706 (7th Cir. 2021).  The hearing committee, as affirmed by the board, determined that this challenge was meritless.  At the least, the respondent's argument, even if credited, does nothing to nullify his violation of State law.  See 940 Code Mass. Regs. § 25.02(2).  See also <u>College-Town, Div. of Interco, Inc</u>. v. <u>Massachusetts Comm'n Against</u> <u>Discrimination</u>, 400 Mass. 156, 163-164 (1987) ("While interpretations of a Federal statute [by a Federal court] which is similar to the State statute under consideration are often helpful in setting forth all the various policy considerations, such interpretations are not binding on a State court construing its own State statute").

    ii.  <u>Nonlawyers (rules 5.4 [a], 5.3 [b], and [c])</u>.[12]  Rule 5.4 (a) prohibits a lawyer from "shar[ing] legal fees with a nonlawyer."  Rule 5.3 (b) provides that "a lawyer who . . . possesses . . . managerial authority in a law firm . . . shall make reasonable efforts to ensure that" the conduct of nonlawyers whom they supervise "is compatible with the professional obligations of the lawyer."  Rule 5.3 (c) provides that such lawyer is responsible for the conduct of their nonlawyer subordinates that would violate the Rules of Professional Conduct if the lawyer "orders or . . . ratifies the conduct involved," or if the lawyer has "managerial . . . [or] direct supervisory authority over the [nonlawyer] and knows of the conduct at a time when its consequences can be avoided or mitigated but fails to take reasonable remedial action."

    The respondent conceded that he shared legal fees with nonlawyers in violation of rule 5.4 (a).  As to rule 5.3 (b), the record supported the hearing committee's conclusion that the respondent violated the rule by failing to supervise his agents or review his client's file, resulting in critical errors in McConaghy's application.  On appeal, the respondent argued that bar counsel

---

[12] Rhode Island rules 5.4 (a), 5.3 (b), and 5.3 (c) are identical to Massachusetts rules 5.4 (a), 5.3 (b), and 5.3 (c) and require no separate analysis.

failed to prove a violation of rule 5.4 (a) with respect to the fourteen unnamed clients in count I.

However, the respondent admitted that he provided no instructions to staff, and there is no

evidence in the record that the respondent supervised staff or regularly reviewed NVA's or ND's

file notes.  Thus, the record supports the hearing committee's conclusion that his failure to

supervise the McConaghy matter was representative of his conduct in connection with the other

unnamed clients.

　　　　The record also supports the hearing committee's conclusion that the respondent violated

rule 5.3 (c) by ratifying, through both action and inaction, the misconduct of his nonlawyer

agents.  For these reasons, the committee's conclusion that the fee agreement violated the Rules

of Professional Conduct is supported.[13]  Furthermore, the record supports the committee's

conclusion that the failure to follow McConaghy's "clear and repeated instructions that she did

not want to pursue a futile loan modification" despite their knowledge that her application was

highly unlikely to succeed violated Mass. R. Prof. C. 1.2 (a), which requires lawyers to pursue

their clients' "lawful objectives."

　　　　iii.   <u>Incompetence, failures of communication, and dishonesty (Rhode Island rules 1.1,</u>

<u>1.4 [a] and [b], and 8.4 [a] and [c])</u>.  Rhode Island Rule of Professional Conduct 1.1 states that a

lawyer "shall provide competent representation to a client."  Rule 1.4 (a) (1)-(3) states that a

lawyer "shall promptly inform the client of any decision or circumstance with respect to which

the client's informed consent . . . is required by these Rules;" "reasonably consult with the client

about the means by which the client's objectives are to be accomplished;" and "keep the client

---

[13] The respondent testified that five of the fifteen clients, despite paying the initial
retainer, never provided the paperwork necessary for loan modification.  The respondent did not
recall giving those clients a refund, leading the hearing committee to conclude that no refunds
were issued.  Under the rules of Massachusetts and Rhode Island, those clients should have
received a full or partial refund.  See Mass. R. Prof. C. 1.5 (a), 5.3 (b)-(c).

reasonably informed about the status of the matter."  Rule 1.4 (b) obligates a lawyer to "explain a matter to an extent reasonably necessary to permit the client to make informed decisions regarding the representation."

Rhode Island Rule 8.4 (a) states that it is professional misconduct for a lawyer to "violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another;" and rule 8.4 (c) prohibits a lawyer from "engag[ing] in conduct involving dishonesty, fraud, deceit or misrepresentation."[14]

The record supports the hearing committee's conclusion that the respondent knew that mortgage loan modification requests had very low rates of success, and specifically that McConaghy's application had a negligible chance of being approved and materially benefiting her.  On intake, McConaghy expressed to NVA that she "did not want to pay money . . . [to attempt] another loan modification if it was unlikely that she would succeed," needing, rather, to "hold on to all the money she could."  The record supports the committee's finding that allowing McConaghy to proceed with modification was incompetent.  See R.I. R. Prof. C. 1.1.

The record further supports the committee's determination that the respondent failed to keep his client informed in any meaningful way.  For example, McConaghy was not notified when ND learned that her bank had initiated foreclosure proceedings, or that ND and the respondent decided to press on with the application regardless.  Given this unchallenged information, the committee's conclusion that the respondent's conduct violated Rhode Island rules 1.4 (a) and (b) is supported.

The record supports the committee's determination that the representations concerning McConaghy's chance of success, as well as the work the respondent was providing, were

---

[14] In all respects relevant to the respondent's case, the corresponding Massachusetts rules contain functionally identical language to the Rhode Island rules discussed supra.

incompetent and deceitful.  For example, despite representations made in the fee agreement, the respondent was not "negotiat[ing]" with McConaghy's lender.  Nor was he "build[ing] a case" for his client.  Accordingly, the committee had ample support for its conclusion that the respondent, either on his own or through his agents, violated Rhode Island rules 8.4 (a) and (c).[15]

     iv.  <u>Communications about the respondent's services (rules 7.1 [a], 7.5 [a] and [d], and 8.4 [a], [c], and [h])</u>.[16]  Rule 7.1 (a) prohibits a lawyer from making a "material misrepresentation" of himself or his services through "false or misleading communication[s]" about the same.  Rule 7.5 (a) prohibits a lawyer from using "a firm name, letterhead, or other professional designation that violates [r]ule 7.1."[17]  Rule 7.5 (d) prohibits a lawyer from falsely "stat[ing] or imply[ing] that they practice in a partnership or other organization."[18]

     Rule 8.4 (a) states that "[i]t is professional misconduct for a lawyer to . . . violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another."  Rule 8.4 (c) states that "engag[ing] in conduct

---

[15] The hearing committee found that there was substantial evidence that the respondent treated all of his mortgage loan modification clients the same.  Thus, although the violations outlined <u>supra</u> were analyzed concerning the specific facts of McConaghy, the findings may be imputed to the fourteen other clients that the respondent served in Massachusetts and Rhode Island.  See, e.g., <u>Matter of Zak</u>, 476 Mass. at 1035-1036, 32 Mass. Att'y Discipline Rep. 637, 638-639 (2016); <u>Matter of Goldberg</u>, 34 Mass. Att'y Discipline Rep. at 135.

[16] Effective October 1, 2022, the Supreme Judicial Court amended the Rules of Professional Conduct.  As relevant here, the court repealed rules 7.1-7.5 and replaced them with new rules 7.1-7.3.  The substance of the rules remains generally the same.  The former rule 7.5 concerning law firm names and purported partnerships is now covered by comment [7] to rule 7.1.  We apply the former rules, which were in effect at the time of the respondent's conduct.  See <u>Matter of Diviacchi</u>, 475 Mass 1013, 1014 n.1 (2016).

[17] Rhode Island rule 7.5 (a) specifies that "[l]aw firm names that are misleading as to the identity of the attorney or attorneys practicing law with the firm are prohibited."

[18] Rhode Island rule 7.5 (d) specifies that lawyers may use the phrase "and Associates" to describe their firm "only when such language is accurate and descriptive of the law firm."

involving dishonesty, fraud, deceit, or misrepresentation" also is misconduct.  Finally, under rule 8.4 (h), "engag[ing] in any other conduct that adversely reflects on [a lawyer's] fitness to practice law" is misconduct.[19]

The respondent did not dispute that his letterhead, which falsely implied that his firm employed "Associates," violated rule 7.5 (d).  This conduct also violated rule 7.1 (a), which requires showing a "material" misrepresentation about the lawyer through "misleading" communications.  A misrepresentation is "material" if it "relates to a matter upon which [a client] could be expected to rely in determining to engage in the conduct in question."  Black's Law Dictionary (6th edition).  As Mass. R. Prof. C. 7.1, comment 2, explains, even "[a] truthful statement is . . . misleading if there is a substantial likelihood that it will lead a reasonable person to formulate a specific conclusion about the lawyer or the lawyer's services for which there is no reasonable factual foundation" [emphasis added].  Rule 7.1 (a) sets forth an objective standard.  Contrary to the board's conclusion, no showing that a client actually was induced to retain the respondent by his misrepresentation is required; instead, rule 7.1 (a)'s materiality standard was met by the respondent's use of a deceptive firm name that implied the existence of "associates," which was both a misrepresentation upon which a client could be expected to rely in choosing whether to engage the respondent and would lead a reasonable person to believe that the respondent's firm was larger than represented.[20]

The hearing committee concluded correctly that the respondent violated rules 8.4 (a), 8.4

---

[19] Massachusetts rule 8.4 (h) has no Rhode Island equivalent.

[20] Firm names and letterheads that falsely imply that a firm employs associates consistently have been found to violate Mass. R. Prof. C. 7.1.  See Matter of Bazile, 33 Mass. Att'y Discipline Rep. 23, (2017) (solo practitioner's use of firm name containing "& Associates" was material misrepresentation in violation of rule 7.1); Matter of Miller, 28 Mass. Att'y Discipline Rep. 608 (2012) (same).

(c), and 8.4 (h).[21]  Because the respondent violated rule 7.5 (d), he also violated rule 8.4 (a).

When the respondent misrepresented his firm as having associates, he engaged in dishonest

conduct in violation of rule 8.4 (c).  This dishonest conduct reflects poorly in turn on his fitness

to practice law in violation of rule 8.4 (h).

c.  Aggravating factors.  The hearing committee concluded that the respondent's lack of

candor, see Matter of Eisenhauer, 426 Mass. 448, 455, cert. denied, 524 U.S. 919 (1998) (board

"must consider a respondent's lack of candor . . . in formulating a recommendation for

discipline"); experience in the practice of law, see Matter of Luongo, 416 Mass. 308, 311-312

(1993) ("An older, experienced attorney should understand ethical obligations to a greater degree

than a neophyte"); the harm caused to clients and the multiplicity of violations, see Matter of

Saab, 406 Mass. 315, 326-327 (1989) (consideration of cumulative effect of several violations is

proper when fixing sanction); and his prior discipline (a one-year diversion agreement)[22] were

aggravating factors.  In addition, the hearing committee determined that bar counsel had not

established that any of the respondent's fifteen clients were "vulnerable" for the purposes of

aggravation.

The board agreed that the respondent's lack of candor, his decade of experience, the harm

caused to his clients, and the violation of numerous disciplinary rules should be considered as

aggravating factors.  The board concluded, however, that the respondent's diversion agreement

---

[21] Following their rejection of the hearing committee's conclusions regarding rules 7.1 (a) and 7.5 (a), the board did not address the committee's conclusions regarding rules 8.4 (a), (c), and (h) explicitly.  I infer that the board accepted those conclusions which they did not expressly contest.

[22] In 2013, the respondent entered a one-year diversion agreement with the office of bar counsel.  The discipline concerned a "lemon law" claim in which the respondent failed to respond to his client's monthly requests for information for three years.  By its terms, the diversion agreement expired after one year and was not a matter of public record.

did not constitute an aggravating factor.  Rather, the board reasoned that doing so could have a

chilling effect on attorneys acceding to diversion agreements in the future, thus risking an

important educational tool, and inapposite to the express terms of the diversion agreement.[23]

Moreover, the board determined that bar counsel's proffered reason for introducing the

agreement into evidence – "notice" that lack of competence and reasonable diligence in keeping

clients informed are disciplinable events – was unsound because (i) "notice" of the rules (or lack

thereof) was not at issue in this case, and (ii) all lawyers have constructive notice of the rules.

See, e.g., In re Discipline of Attorney, 442 Mass. 660, 669 (2004) (ethical rules of legal

profession need not be drawn to precise standards of clarity required of rules of conduct for

laymen).  See also Mass. R. Prof. C. 1.1, 1.4 (a).  The board agreed with the hearing committee

that none of the respondent's fifteen clients was "vulnerable" as that term is understood in our

---

[23] On entering into the 2013 diversion agreement, "investigation and disposition of the underlying complaint" was stayed pending successful compliance with the requirements of the agreement.  The respondent successfully complied; as such, he was entitled to "have no record of discipline from this matter."

The hearing committee mistakenly relied on two cases for the proposition that a diversion agreement can constitute an aggravating factor.  In In re Carmel-Montes, the diversion agreement in question concerned the specific act (i.e., claiming mistake after treating retainer agreement as flat fee) for which the attorney later faced discipline.  35 Mass. Att'y Discipline Rep. 35, 48-49 (2019).  Additionally, the attorney in that matter earned both an admonition and public reprimand in the time between his diversion agreement and the charged conduct.  Id. at 49.  Here, the respondent has faced no formal discipline because he successfully complied with the terms of his diversion agreement; nor are the charges that gave rise to the 2013 agreement substantially similar to the conduct under consideration.

In the case of In re Gross, 435 Mass. 445, 16 Mass. Att'y Discipline Rep. 214 (2000), the attorney received an "informal admonition" for misrepresentation one year before being charged with more substantial conduct.  Id. at 446.  There is no reference to a diversion agreement.  See Massachusetts Bar Discipline:  History, Practice, and Procedure; the Board of Bar Overseers of the Supreme Judicial Court, at 161 (2018) ("In some instances where an admonition would otherwise be the appropriate sanction for a respondent's . . . lack of diligence, [bar counsel] instead may enter into a diversion agreement with the respondent.  Diversion to an alternative emotional, remedial, or rehabilitative program as a substitute to formal discipline is authorized under SJC Rule 4:01" [internal quotation omitted]).

case law.[24]

     d. <u>Mitigating factors</u>.  The hearing committee did not find any mitigating factors, and the board adopted this finding.  There is nothing in the record to question that determination.[25]

     e. <u>Appropriate sanction</u>.  The "primary concern in bar discipline cases is 'the effect upon, and perception of, the public and the bar.'"  <u>Matter of Crossen</u>, 450 Mass. 533, 573 (2008), quoting <u>Matter of Finnerty</u>, 418 Mass. 821, 829 (1994).  See, e.g., <u>Matter of Alter</u>, 389 Mass. 153, 156 (1983).  "The purpose of the disciplinary rules and accompanying proceedings is to protect the public and maintain its confidence in the integrity of the bar and the fairness and impartiality of our legal system."  <u>Matter of Curry</u>, 450 Mass. 503, 520-521 (2008).  "The appropriate level of discipline is that which is necessary to deter other attorneys and to protect the public."  <u>Id</u>. at 530, citing <u>Matter of Concemi</u>, 422 Mass. 326, 329 (1996).  The sanction imposed should not be "markedly disparate" from sanctions imposed on other attorneys for

---

    [24] A client is "vulnerable" when the client (i) has limited education, (ii) has limited or no ability to speak English, (iii) is elderly, (iv) is unsophisticated, or (v) is dealing with a calamitous personal situation.  See <u>Matter of Hayes</u>, BBO No. 226790, 2022 WL 9591182 (June 13, 2022) (limited education); <u>Matter of Cobb</u>, 445 Mass. 452, 21 Mass. Att'y Discipline Rep. 93, 126 (2005) (limited ability to speak or understand English); <u>Matter of Font</u>, 30 Mass. Att'y Discipline Rep. 155, 156 (2014) (mother dealing with suicide of her veteran son); <u>Matter of Pemstein</u>, 16 Mass. Att'y Discipline Rep. 339, 345 (2000) (disabled client).

    In the case of McConaghy, she was an educated professional who understood the limitations of mortgage modification services.  Bar counsel did not to produce evidence that any other client was "vulnerable" as the term is used in our jurisprudence.

    [25] Before the committee, the respondent argued in mitigation that McConaghy's lender engaged in "unfair and deceptive acts."  The misconduct of others is not a mitigating factor.  See <u>Matter of Laroche-St. Fleur</u>, 490 Mass. 1020, 1024 (2022).  Moreover, as the hearing committee correctly noted, restitution after bar counsel's involvement is not mitigating.  See <u>Matter of Johnson</u>, 452 Mass. 1010, 1011-1012 (2008).  Finally, the respondent cited as mitigating several changes he has made to his practice, including removing "& Associates" from his firm name, adding his telephone number to his engagement agreement, and terminating his fee arrangement with NVA.  While these are prudent decisions, "the type of conduct expected of an ordinary reasonable attorney" is not a mitigating factor.  See <u>Matter of Zak</u>, 476 Mass. at 1040-1041, quoting <u>Matter of Dawkins</u>, 412 Mass. 90, 96 (1992).

similar misconduct, each case should be decided on its own merits, and the attorney should receive "the disposition most appropriate in the circumstances."  See Matter of Pudlo, 460 Mass. 400, 404 (2011), quoting Matter of the Discipline of an Attorney, 392 Mass. 827, 837 (1984). See also Matter of Grayer, 483 Mass. 1013, 1018 (2019); Matter of Goldberg, 434 Mass. 1022, 1023 (2001), and cases cited.  "In considering the appropriate sanction, 'the board's recommendation is entitled to substantial deference.'"  Matter of Zankowski, 487 Mass. at 153, quoting Matter of Tobin, 417 Mass. 81, 88 (1994).

In determining its recommended sanction, the board sorted the respondent's rule violations into four categories.  The first area of misconduct concerns the respondent's fee agreement and fee collection practices.  This arrangement allowed the respondent to collect fees every month, even if no work was performed, in violation of rules 1.5, 8.4 (c), and 8.4 (h).  The board relied on the following bar discipline cases as factually analogous:  Matter of Zak, 476 Mass. 1034 (disbarment for running various mortgage relief scams, including charging and collecting excessive fees for useless services, failing to return unearned fees, commingling personal and client funds, and making intentionally misleading statements about services to hundreds of economically, educationally, and linguistically vulnerable clients); In re Goldstone, 445 Mass. 551, 552, 21 Mass. Att'y Discipline Rep. 288 (2005) (disbarment for intentional overbilling and "collecting hundreds of thousands of dollars in fees" to which attorney was not entitled); and Matter of Zankowski, 487 Mass. 140 (two-year suspension for intentionally billing 450 hours of false work while lying about work attorney had performed).

The board noted, however, that the respondent's dishonesty was not "as pervasive or consequential" as that of the attorneys in the cases cited.  Indeed, while it is undisputed that both the attorney in Matter of Zak and the respondent preyed on distressed homeowners, the import of the misrepresentations, number of victims, and the resulting fallout were more severe in Matter

of Zak than they are in the case at bar.[26]  The attorney in In re Goldstone threatened retaliation

against his clients, extorted funds to which he was not entitled, and resisted all opportunities to

make restitution.  Id. at 566.  The board therefore reasoned that the respondent's conduct lacked

the same degree of affirmative deception and intentional malice and, as such, warranted a lesser

sanction.

The second area of misconduct related to the respondent's failure to communicate with

his clients, as well as his delegation of work to unsupervised nonlawyers and subsequent

ratification of their conduct.  This conduct encompassed the respondent's violations of rules 1.1

and 1.4, see Matter of Zinni, 31 Mass. Att'y Discipline Rep. 722 (2015) (public reprimand

appropriate for estate attorney for failure to recognize obvious undue influence on elderly client

with dementia); Matter of Kane, 13 Mass. Att'y Discipline Rep. 321 (1997) (public reprimand

generally appropriate where lawyer fails to act with reasonable diligence in representing client or

otherwise neglects legal matters and lawyer's misconduct causes serious injury to client), and

rule 5.3, see Matter of Goldberg, 34 Mass. Att'y Discipline Rep. 135 (2018) (public reprimand

imposed where attorney failed to supervise both legal and nonlegal staff in high-volume

consumer debt collection practice); Matter of Hopper, 25 Mass. Att'y Discipline Rep. 259 (2009)

(stipulation to public reprimand for IOLTA violations and failure to supervise nonlawyer

bookkeeper).

The board determined that the respondent's office practices were worse than the cases

cited supra.  Indeed, the outsourcing of all major decisions and client work to nonlawyers was a

feature of the respondent's business model.  Violations of rule 5.3, the board noted, often result

---

[26] In soliciting his fee, the attorney in Matter of Zak misrepresented that he "was the only
lawyer who knew how to obtain permanent loan modifications and that he would obtain trial
loan modifications within thirty to sixty days," while also misrepresenting "that [he] sued the
bank in every case."  Id. at 1037.

in term suspensions.  As such, the failure to supervise cases cited by the hearing committee provided better guidance for the appropriate sanction.  See <u>Matter of Kendall</u>, 33 Mass. Att'y Discipline Rep. 243 (2017) (stipulation to three-month stayed suspension for failure to supervise paralegal, resulting in neglect of client matter, plus other misconduct); <u>Matter of Perrault</u>, 29 Mass. Att'y Discipline Rep. 531 (2013) (stipulation to three-month suspension, stayed for one year on conditions, for failure to supervise associate, leading to delays, increased cost to client, and excessive bills leading to clearly excessive fee).

The third area of misconduct concerned the respondent's sharing fees with nonlawyers in violation of rule 5.4.  The board noted that the typical sanction for a rule 5.4 violation is an admonition.  See <u>Admonition 08-04</u>, 24 Mass. Att'y Discipline Rep. 848 (2008) (admonition for solo practitioner who signed agreement giving one-third of his earned fees to nonlawyer administrative assistant); <u>Admonition 99-31</u>, 15 Mass Att'y Discipline Rep. 708 (1999). However, the board also observed that the respondent's fee-sharing scheme cannot be viewed in isolation.  Rather, automated fee sharing was integral to the arrangement between the respondent, NVA, and ND, and every other violation ultimately stemmed from the respondent's sharing fees with nonlawyers.  See, e.g., <u>In re Hilson</u>, 448 Mass. 603 (2007) (in sanctioning attorneys, court "may consider the cumulative effect of multiple violations committed by a respondent" [citation omitted]).

The fourth area of misconduct, which the respondent conceded, was his misrepresentation that he was part of a legal organization as opposed to a solo practitioner.  See Mass. R. Prof. C. 7.1 (a), 7.5 (a) and (d).  Typically, if a misleading firm name is combined with other conduct, such as the failure to supervise nonlegal staff, the sanction is a public reprimand. See <u>Matter of Bazile</u>, 33 Mass. Att'y Discipline Rep. 23 (2017) (public reprimand for depositing personal funds to IOLTA account, recordkeeping violations, using misleading firm name, and

sharing legal fees with nonlawyer); <u>Matter of Godbout</u>, 18 Mass. Att'y Discipline Rep. 254

(2002) (stipulation to public reprimand for misconduct including rule 7.5 [d] violation for

suggesting or implying partnership when there was none, with aggravation).

In sum, the board's recommended sanction of one year and one day is appropriate.[27]

4. <u>Conclusion</u>.  It is thus ORDERED that:

1. Daniel G. Ruggiero hereby is suspended from the practice of law in the Commonwealth for

a period of one year and one day.  In accordance with S.J.C. Rule 4:01, § 17 (3), the suspension

shall be effective thirty (30) days after the date of the entry of this Order.  The respondent, after the

entry of this Order, shall not accept any new retainer or engage as a lawyer for another in any new

case or legal matter of any nature.  During the period between the entry date of this Order and its

effective date, however, the respondent may wind up and complete, on behalf of any client, all matters

which were pending on the entry date.

It is FURTHER ORDERED that:

2.      Within fourteen (14) days of the date of entry of this Order, the respondent shall:

(a)     file a notice of withdrawal as of the effective date of the suspension with every

        court, agency, or tribunal before which a matter is pending, together with a copy

        of the notices sent pursuant to paragraphs 2 (c) and 2 (d) of this Order, the client's

        or clients' place(s) of residence, and the case caption and docket number of the

        client's or clients' proceedings;

(b)     resign as of the effective date of the suspension all appointments as guardian,

        executor, administrator, trustee, attorney-in-fact, or other fiduciary, attaching to

        the resignation a copy of the notices sent to the wards, heirs, or beneficiaries

---

[27] The length of this term suspension will require the respondent to apply for
reinstatement.

pursuant to paragraphs 2 (c) and 2 (d) of this Order, the place of residence of the wards, heirs, or beneficiaries, and the case caption and docket number of the proceedings, if any;

(c)    provide notice to all clients and to all wards, heirs, and beneficiaries that the lawyer has been suspended; that he is disqualified from acting as a lawyer after the effective date of the suspension; and that, if not represented by cocounsel, the client, ward, heir, or beneficiary should act promptly to substitute another lawyer or fiduciary or to seek legal advice elsewhere, calling attention to any urgency arising from the circumstances of the case;

(d)    provide notice to counsel for all parties (or, in the absence of counsel, the parties) in pending matters that the respondent has been suspended and, as a consequence, is disqualified from acting as a lawyer after the effective date of the suspension;

(e)    make available to all clients being represented in pending matters any papers or other property to which they are entitled, calling attention to any urgency for obtaining the papers or other property;

(f)    refund any part of any fees paid in advance that have not been earned; and

(g)    close every IOLTA, client, trust or other fiduciary account and properly disburse or otherwise transfer all client and fiduciary funds in his possession, custody, or control.

All notices required by this paragraph shall be served by certified mail, return receipt requested, in a form approved by the board.

3.    Within twenty-one (21) days after the date of entry of this Order, the respondent shall file with the Office of the Bar Counsel an affidavit certifying that the respondent has complied fully with the provisions of this Order and with bar

disciplinary rules.  Appended to the affidavit of compliance shall be:

(a)    a copy of each form of notice, the names and addresses of the clients, wards, heirs, beneficiaries, attorneys, courts, and agencies to which notices were sent, and all return receipts or returned mail received up to the date of the affidavit. Supplemental affidavits shall be filed covering subsequent return receipts and returned mail.  Such names and addresses of clients shall remain confidential unless otherwise requested in writing by the lawyer or ordered by the court;

(b)    a schedule showing the location, title and account number of every bank account designated as an IOLTA, client, trust or other fiduciary account and of every account in which the respondent holds or held as of the entry date of this Order any client, trust, or fiduciary funds;

(c)    a schedule describing the respondent's disposition of all client and fiduciary funds in the respondent's possession, custody or control as of the entry date of this Order or thereafter;

(d)    such proof of the proper distribution of such funds and the closing of such accounts as has been requested by the bar counsel, including copies of checks and other instruments;

(e)    a list of all other State, Federal, and administrative jurisdictions to which the respondent is admitted to practice;

(f)    the residence or other street address where communications to the respondent may thereafter be directed; and

(g)    any and all bar registration cards issued to the respondent by the board.

The respondent shall retain copies of all notices sent and shall maintain complete records of the steps taken to comply with the notice requirements of S.J.C. Rule 4:01, § 17.

4.      Within twenty-one (21) days after the entry date of this Order, the respondent

shall file with the Clerk of the Supreme Judicial Court for Suffolk County:

(a)     a copy of the affidavit of compliance required by paragraph 3 of this Order;

(b)     a list of all other State, Federal, and administrative jurisdictions to which the

respondent is admitted to practice; and

(c)     the residence or other street address where communications to the respondent may

thereafter be directed.

5.      The respondent's reinstatement to the practice of law in the Commonwealth shall

be pursuant to S.J.C. Rule 4:01, § 18 (2), (4), and (5).

By the Court,

/s/ Dalila Argaez Wendlandt
Associate Justice

ENTERED:  March 15, 2023